# IN THE COURT OF APPEALS OF IOWA

No. 21-0169
Filed November 3, 2021

IN RE THE MARRIAGE OF BRADLEY WAYNE JOHNSON
AND KAYLA JAN JOHNSON

Upon the Petition of
BRADLEY WAYNE JOHNSON,
        Petitioner-Appellee,

And Concerning
KAYLA JAN JOHNSON,
        Respondent-Appellant.
_____

Appeal from the Iowa District Court for Bremer County, Chris Foy, Judge.

Kayla Johnson appeals the decree dissolving her marriage to Bradley Johnson. **AFFIRMED AS MODIFIED AND REMANDED.**

Andrew B. Howie of Shindler, Anderson, Goplerud & Weese, P.C., West Des Moines, for appellant.

Shanna Chevalier of Laird & Luhring, Waverly, for appellee.

Considered by Mullins, P.J., and May and Ahlers, JJ.

**MULLINS, Presiding Judge.**

Kayla Johnson appeals the decree dissolving her marriage to Bradley Johnson (Brad). She argues the court erred in placing their three children in Brad's physical care instead of in the parties' shared care. In the alternative, she argues the amount of visitation she was awarded is inadequate. Brad requests an award of appellate attorney fees.

## I.      Background Facts and Proceedings

While these parents' generally agree that each is a good parent to their three children, their accounts of their share of the parenting and conduct before and after their separation is nothing less than contradictory. Each paints themselves as a model parent who fosters the children's relationships with the other. Each also paints the other as a parent who does not foster the children's relationships with the other parent. Based on Kayla's dishonesty, deceit, and her denial of wrongdoing in relation to losing her employment, the district court recognized Kayla's willingness to shade the truth and found Brad to be more credible. Giving deference to this credibility determination, we make the following factual findings based on the evidence we find credible.[1]

---

[1] Based on our complete review of the record, we find Brad's testimony generally credible because, in his testimony, he was willing to concede to the existence of facts that were detrimental to his position in the case.

We find the testimony of the children's psychiatric nurse practitioner highly credible because she was a neutral and unbiased witness.

We assign little evidentiary value to the testimony of Brad's mother and Kayla's parents given their understandable favor for their respective children.

We find generally not credible the testimony of Kayla and her significant other, Rick. In their testimony, when faced with facts adverse to Kayla's case, they either denied such facts outright or attempted to bend them in Kayla's favor, even when such facts were supported by other evidence and the testimony of the witnesses we find credible.

The parties married in 2009. The marriage produced three children, born in 2010, 2012, and 2015. Early on in the marriage, Brad worked and Kayla was a stay-at-home mom. In time, Kayla furthered her education and became a nurse. She began working more and progressed to full-time employment in 2016. Brad has always been an involved parent, but his involvement steadily increased over the years. According to Brad, the parties have shared parenting duties. On a typical day, Kayla would get the children ready and transport them to school and daycare, and Brad would pick them up from school and daycare, make supper, and organize the home. Normally, Brad would get the children ready for bed, and then both parties would lay down with them. According to Brad, in the few years leading up to the parties' separation, Kayla's involvement in the children's daily routine decreased due to her taking a new job with longer hours and going on more business trips. She also began going out with friends quite often, leaving Brad to care for the children. According to Kayla, the parties shared parenting duties, but she was primarily responsible for organizing and attending to their medical needs.

The parties separated in or about April 2019, when Brad learned Kayla was having an affair.[2] The parties apparently participated in marital counseling, but Kayla continued her relationship with her new boyfriend, Rick, and she even introduced him to the children by May.[3] On the first day of school in August, the

---

[2] We expressly disavow any indication of fault against Kayla for her extramarital affair or other alleged affairs—Iowa is a no-fault dissolution-of-marriage state. *See In re Marriage of Fennelly*, 737 N.W.2d 97, 103 (Iowa 2007). "[W]e only consider a party's indiscretions if [a] child was harmed by the behavior." *In re Marriage of Rothfus*, No. 13-1745, 2014 WL 2885340, at *4 (Iowa Ct. App. June 25, 2014).

[3] At the time, Rick was still married to Andrea, who, in time, became Brad's girlfriend. By the time of trial, Brad had yet to introduce the children to Andrea.

oldest child drew an "all about me" picture of her family. It depicted her on one side of the photo surrounded by "mom," "my sis," "my bro," and "my mom's boyfriend." "My dad" was located on the opposite end of the drawing standing next to one of the child's friends.

Ultimately, in August, Brad petitioned for dissolution of the parties' marriage. Up to this point and thereafter, the parties were sharing care of the children. Then, in September, there was a domestic altercation between the parties during a custody exchange. According to the ensuing police report, Kayla pushed and scratched Brad. Kayla admitted to the officer that she pushed Brad. Kayla testified she was also injured by Brad during this incident. That allegation was not contained in the police report. Kayla was arrested on a charge of domestic abuse assault, which was still pending at the time of the dissolution trial. A no-contact order was entered between the parties, which continued to be in place at the time of the dissolution trial. The no-contact order was later modified to allow text messaging between the parties concerning the children and allow them to meet in a public place for exchanges. An assessment by the Iowa Department of Human Services (DHS) was conducted because the children were present, during which one of the children reported dislike for Rick due to his temper. The middle child has reported Rick has spanked him. Kayla testified she intends to move in with Rick following dissolution and would like to marry him.

Later in September, Kayla was terminated from her employment as a nurse for HIPAA violations, one involving her accessing Rick's then wife's (Andrea) medical records, and another involving her accessing records of another person Brad started dating for a short period of time after petitioning for dissolution. At

trial, Kayla continued to deny the allegations. Based on the evidence, we, like the district court, find her "denial of fault or culpability . . . unbelievable." She now works part time for Rick's farming operation.

Following the assault incident, Brad moved for a temporary-matters hearing and requested he be awarded temporary physical care. A hearing was scheduled for early November. Before the hearing occurred, Kayla's father[4] reported to DHS that Brad leaves the children home alone and he allowed them to go to the park unsupervised. DHS investigated and found the allegation unsubstantiated.

Brad continues to live in Janesville, the town where the family lived before the separation. His house has four bedrooms, and each child has their own room. His home is four minutes away from the children's school. He works for an implement manufacturer, and his hours are 7:00 a.m. to 3:30 p.m. Currently, he leaves for work at 6:30 a.m., and Brad's mother gets the children ready and off to school.

After the marital home was sold, Kayla began renting a home outside of Shell Rock. According to Brad, the children reported to him that, when with Kayla, they only go to the mother's residence to sleep and spend most of their time at Rick's home. The rest of the evidence confirms this testimony. Rick's home is thirty-five minutes from the children's school, and Kayla's residence is twenty-three minutes away from the school. According to Brad, the children have reported to Brad that Rick has a temper and yells at them. Kayla claims Rick is nice to the children and Rick just has a loud voice.

---

[4] Brad used to be extremely close with Kayla's parents. Those relationships have since soured.

Both parties have claimed that the other says negative things about one another and their significant others around the children. While the record is clear that Brad said some negative things about Kayla and Rick to Kayla's parents early on and he still harbors some animosity and distrust for Kayla, we find Kayla's claims he would subject the children to such statements lacking in credibility given her above-stated willingness to shade the truth. Given Kayla and Rick's behavioral indicators, personalities, manipulative tendencies, and relationship dynamics, we have no doubt that they have said negative things about Brad in front of the children. The evidence shows Kayla and Rick have manipulative tendencies to further their goals in their separate dissolution proceedings.

There have been occasions when Kayla has requested to have the children in her care while Brad is at work, which Brad has largely denied because he believes the children are not comfortable around Rick, with whom Kayla spends the bulk of her time, and Brad wants to have the children under a consistent schedule. That said, he has allowed Kayla extra visitation time during the summer months. He has also exchanged time for Kayla to take the children to family events. Kayla claims Brad had every other week off from work during the COVID-19 pandemic and he still had a babysitter watch the children during those weeks so he could spend time with his girlfriend, Andrea. Brad replied he was working extra jobs to pay bills during his weeks off because Kayla refused to pay for some of the familial bills she agreed to pay for during the separation.

At trial, Kayla attempted to paint Brad as mentally unstable. True, Brad struggled with his mental health following his discovery of Kayla's infidelity, there were signs of suicidal thoughts on his part, and, by the time of trial, he had

discontinued taking his prescribed mental-health medication. But Kayla agrees he is a stable and capable parent, and we conclude the foregoing mental afflictions were episodic results of Brad learning of Kayla's infidelity and the parties' ensuing separation.

Brad agrees the communications between him and Kayla have been respectful and the conflict between the parties will hopefully abate once their marriage is dissolved. The parties generally agree on most child-rearing issues—where the children will go to school, what they should eat, when they should go to bed, and the activities in which they participate.

After receiving temporary physical care, Brad did plan to change the children's doctor and therapist, for which Kayla faults him. Brad explained he did set up an appointment with a new doctor because he was too embarrassed to show his face at the clinic that fired Kayla, and he assumed Kayla would be as well. And he felt the therapist favored Kayla and was biased against him. The therapist previously warned she would not be involved with the dissolution litigation, and when Brad asked for information from the therapist that had been provided to Kayla but not him, the therapist declined to see the children anymore.

Brad testified the middle child, after being with Kayla and Rick on Memorial Day in May 2020, reported that Rick yelled at him so much that he urinated in his pants, after which Rick yelled at him for doing so, to an extent that the child vomited on himself. Kayla denied this occurred, testifying to a different version of events. A psychiatric nurse practitioner who saw the child in July 2020 testified the middle child reported Rick "squeezes us and carries us and screams at us, Mommy tells him to stop hurting us, and he doesn't listen." The child also reported Rick carries

him to his room and holds the door closed so he cannot get out and sometimes the child locks his door so Rick cannot get in. Rick also carries the child out of the house when his children are sleeping so they do not get woken up. The child told the nurse practitioner of the Memorial Day incident, stating Rick put him in timeout in the shower because he was being too noisy in the house, and Rick held the door closed so he could not get out. The child had to go to the bathroom, but Rick would not let him out to do so. So the child accidently wet himself, after which Rick yelled at him until he slobbered or vomited on himself. The child also reported that Rick and Kayla fight. The nurse practitioner also met with the oldest child in August. That child reported she does not like being at Rick's house. Both children indicated being fearful of Rick, and the nurse practitioner opined the children spending time at his home could be detrimental to their mental health.[5] As noted, the evidence shows Kayla spends essentially all of her time with the children at Rick's home.

Evidence was presented that Rick has a history of domestic violence. When asked about her experience during the last few years of their marriage, Andrea testified: "Black eyes. He choked me up against a wall. Held me against a dresser. Held me in a room. Split my lip open. Shoved me around the basement where he thought he broke my elbow. Drug me out of my car by my hair." Andrea also testified Rick abused their children. When asked about the alleged abuse at trial, Rick denied it.[6] He denied pretty much every other allegation of his aggression toward the parties' children.

---

[5] The nurse practitioner testified, based on her professional experience, neither of the children were coached to make these statements.

[6] In response to a request for admissions during the dissolution proceedings for Rick and Andrea's marriage as to whether he abused Andrea, Rick pled the Fifth.

Ultimately, a dissolution trial was held in August of 2020. Essentially the only issue before the court was whether to grant Brad's request for physical care with visitation to Kayla or Kayla's request for shared physical care. The court found shared care would be contrary to the children's best interests. The court highlighted the strained and unhealthy relationship between the parties and Kayla putting her relationship with Rick before the emotional and psychological well-being of the children. The court found the children's best interests mandated awarding Brad physical care. The court awarded Kayla visitation as can be agreed to by the parties or, if unable to agree, every other Wednesday from after school or 4:00 p.m. until 8:00 p.m. and every other weekend from Friday after school or 4:00 p.m. until the start of school or 8:00 a.m. on Monday, six weeks in the summer, half of winter break, alternating holidays, and every other spring break.

Kayla appeals.

## II. Standard of Review

Appellate review of dissolution proceedings is de novo. Iowa R. App. 6.907; *In re Marriage of Larsen*, 912 N.W.2d 444, 448 (Iowa 2018). While we give weight to the factual findings of the district court, especially when considering the credibility of witnesses, we are not bound by them. Iowa R. App. P. 6.904(3)(g); *Fennelly*, 737 N.W.2d at 100. Because the court bases its decision on the unique facts of each case, precedent is of little value. *In re Marriage of Brown*, 776 N.W.2d 644, 647 (Iowa 2009). As to child custody, our principal consideration is the best

---

At the trial precipitating this appeal, he pled the Fifth as to several other questions asked of him about Andrea.

interests of the children. Iowa R. App. P. 6.904(3)(o); *see In re Marriage of Weidner*, 338 N.W.2d 351, 356 (Iowa 1983).

**III.    Analysis**

A.    Physical Care

Kayla[7] challenges the district court's decision to place the children in Brad's physical care rather than in the parties' shared care. Where, as here, "joint legal custody is awarded to both parents, the court may award joint physical care to both joint custodial parents upon the request of either parent." Iowa Code § 598.41(5)(a) (2019). "'Physical care' means the right and responsibility to maintain a home for the minor child[ren] and provide for the routine care of the child[ren]." *Id.* § 598.1(7). Under a joint-physical-care arrangement, "both parents have rights and responsibilities toward the child[ren] including but not limited to shared parenting time with the child[ren], maintaining homes for the child[ren], providing routine care for the child[ren] and under which neither parent has physical care rights superior to those of the other parent." *Id.* § 598.1(4). Physical-care determinations are based on the best interests of *children*, not "upon perceived fairness to the *spouses*." *In re Marriage of Hansen*, 733 N.W.2d 683, 695 (Iowa 2007). "The objective of a physical care determination is to place the children in the environment most likely to bring them to health, both physically and mentally, and to social maturity." *Id.*

---

[7] In the introduction to her argument, Kayla argues Brad plagued the proceedings with irrelevant evidence concerning the dissolution of Rick and Andrea's marriage. But both sides focused on the other's significant other. Both sides did that, so she has no cause to complain. In any event, we have no control over how the parties tried their case, and the record before us is what it is.

We consider the following nonexclusive factors in determining whether a joint-physical-care arrangement is in the best interests of children:

> (1) "approximation"—what has been the historical care giving arrangement for the child[ren] between the two parties; (2) the ability of the spouses to communicate and show mutual respect; (3) the degree of conflict between the parents; and (4) "the degree to which the parents are in general agreement about their approach to daily matters."

*In re Marriage of Berning*, 745 N.W.2d 90, 92 (Iowa Ct. App. 2007) (quoting *Hansen*, 733 N.W.2d at 697–99).

We first consider approximation. The district court expressly concluded each parent would be a suitable physical custodian for the children. We agree. Under such a circumstance, stability and continuity of caregiving are primary factors in considering whether joint physical care should be ordered. *Hansen*, 733 N.W.2d at 696. The evidence is clear that the parties' parenting of the children has been a team effort. "[L]ong term, successful, joint care is a significant factor in considering the viability of joint physical care after" dissolution. *Id.* at 697. This factor weighs in favor of a shared-care arrangement.

We turn to the parties' ability to communicate and show mutual respect and the degree of conflict between them. *Id.* at 698. While there has been a high degree of conflict and mistrust between the parties, Brad agreed in his testimony that the communications between him and Kayla have been respectful and he hopes the conflict between the parties will abate once their marriage is dissolved. But our review discloses Kayla and Rick do not show respect for Brad in their home when the children are present. This is an impediment to the viability of a shared-care arrangement. Further, we do not believe the distrust between the parties,

which has been exacerbated by their choices of significant others, will end any time soon. This "lack of trust poses a significant impediment to effective co-parenting." *Id.* And "[j]oint physical care requires substantial and regular interaction between divorced parents on a myriad of issues." *Id.* The parties' relationship since their separation has been plagued with charge and countercharge, and reality suggests the possibility that spouses may be able to settle their differences is low. *See id.* At the end of the day, a rocky dissolution "presents a significant risk factor that must be considered in determining whether joint physical care is in the best interest of the children." *Id.*

As to the final factor, "the degree to which the parents are in general agreement about their approach to daily matters," *id.* at 699, the parties generally agree on most child-rearing issues—where the children will go to school, what they should eat, when they should go to bed, and the activities in which they participate, although there is a clear divergence as to how the children are disciplined while in each parent's care.

So the only meaningful impediment to a shared-care arrangement is the conflict and distrust between the parties. But the foregoing factors are not exclusive and always determinative. *Id.* at 699. We have to look at the total setting to determine what is in the best interests of the children. *Id.* Upon our de novo review of the record and consideration of the *Hansen* factors and other relevant matters,[8] we conclude an award of joint physical care would be contrary to the

---

[8] "The factors the court considers in awarding custody are enumerated in Iowa Code section 598.41(3)." *In re Marriage of Courtade*, 560 N.W.2d 36, 37 (Iowa Ct. App. 1996). "Although Iowa Code section 598.41(3) does not directly apply to *physical care* decisions, . . . the factors listed here as well as other facts and

children's best interests. *See* Iowa Code § 598.41(5)(a). Kayla and the children spend essentially all of their time with Rick when the children are in Kayla's care. The children are fearful of Rick and have stated their desire to not spend time around him. And Kayla's relationship with Rick fuels the conflict between the parties. While the parties have both been involved parents and they generally agree on child-rearing practices, we agree with the district court that the level of distrust and conflict between the parents renders a shared-care arrangement unfeasible. Further, being in the care of Kayla and Rick on an equal basis could be detrimental to the children's emotional, mental, and perhaps physical well-being. We affirm the court's denial of Kayla's request for joint physical care.

B.      Visitation

Kayla argues the amount of visitation she was awarded is inadequate. "Liberal visitation rights are in the best interests of the children" and children "should be assured the opportunity for the maximum continuing physical and emotional contact with *both* parents." *In re Marriage of Ruden*, 509 N.W.2d 494, 496 (Iowa Ct. App. 1993); *accord* Iowa Code § 598.41(1)(a). "Although liberal

---

circumstances are relevant in determining" physical care. *Hansen*, 733 N.W.2d at 696. We note our consideration of whether each parent would be a suitable custodian, whether the children will suffer due to lack of active contact with and attention from both parents, whether the parents can effectively communicate about the children's needs, whether both parents have actively cared for the children, whether each parent can support the other's relationship with the children, whether one or both parents agree to or oppose shared physical care, and the geographic proximity of the parents. *See* Iowa Code § 598.41(3)(a)–(e), (g), (h). We also note our consideration of the characteristics of the children and parents, the children's needs and the parents' capacity and interests in meeting the same, the relationships between the parents and children, the effect of continuing or disrupting an existing physical-care arrangement, the nature of each proposed environment, and any other relevant matter disclosed by the evidence. *See In re Marriage of Winter*, 223 N.W.2d 165, 166–67 (Iowa 1974).

visitation is the benchmark, our governing consideration in defining visitation rights is the best interests of the children, not those of the parent seeking visitation." *In re Marriage of Brainard*, 523 N.W.2d 611, 615 (Iowa Ct. App. 1994).

As noted, the court awarded Kayla visitation as can be agreed to by the parties. If the parties were unable to agree, then visitation would be every other Wednesday from after school or 4:00 p.m. until 8:00 p.m. and every other weekend from Friday after school or 4:00 p.m. until the start of school or 8:00 a.m. on Monday, six weeks in the summer, half of winter break, alternating holidays, and every other spring break. She requests she be awarded one mid-week overnight visitation per week. Upon our review, we agree Kayla should be allowed additional time for regular visitation. We modify the decree to provide Kayla one mid-week overnight visitation on Wednesday from after school or 4:00 p.m. until the start of school or 8:00 a.m. on Thursdays. Unless otherwise agreed between the parties, when school is in session, Kayla shall have the sole responsibility for transporting the children from school at the beginning of her Wednesday overnight visit and back to school on Thursday morning and, when school is not in session, Kayla shall be responsible for transporting the children to and from Brad at the beginning and end of her visit. We also emphasize the visitation schedule outlined in the decree and this opinion are minimum guidelines and the parties can certainly expand beyond the time ordered. *In re Marriage of Heiar*, 954 N.W.2d 464, 472 (Iowa Ct. App. 2020).

C.     Appellate Attorney Fees

Brad requests an award of appellate attorney fees. He argues Kayla is underemployed, he was required satisfy marital debts during the proceedings

leaving him underwater, and he had to defend the district court's decision on appeal. Kayla responds the parties' income disparity shows Brad has sufficient funds to pay his attorney fees and, based on her income as determined by the district court, she has a limited ability to pay both her fees and Brad's.

"Appellate attorney fees are awarded upon our discretion and are not a matter of right." *Id.* at 473. "When considering whether to exercise our discretion, we consider the needs of the party seeking the award, the ability of the other party to pay, and the relative merits of the appeal." *Id.* (altered for readability). Brad was obligated to defend the physical care decision, which was the central focus of Kayla's appeal, yet Kayla scored a minor victory on visitation. Upon our review, we find Brad is entitled to some appellate attorney fees. Because Brad has not submitted an attorney-fee affidavit in this appeal, we are unable to determine a reasonable award, so "we remand the issue of appellate attorney fees to the district court to determine a reasonable award." *Id.*

## IV.    Conclusion

We affirm the district court's physical care decision, modify the visitation schedule, and remand on the issue of an award of appellate attorney fees in favor of Brad.

**AFFIRMED AS MODIFIED AND REMANDED.**